IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ANTWANE J. RHODES,

       Petitioner,                  Civ. N0. 2:15-cv-2756
                                     Crim. No. 2:12-cr-00122
       v.                      JUDGE MICHAEL H. WATSON
                                     Magistrate Judge King

UNITED STATES OF AMERICA,

       Respondent.

## ORDER and
## REPORT AND RECOMMENDATION

Petitioner, a federal prisoner, brings this action for a writ of habeas corpus under 28 U.S.C. § 2255. This matter is before the Court on the *Motion to Vacate under 28 U.S.C. § 2255*. (Doc. 94), Petitioner's *Memorandum in Support* (Doc. 95), Respondent's *Response in Opposition* (Doc. 108), Petitioner's *Reply* (Doc. 111), and the exhibits of the parties.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the *Motion to Vacate under 28 U.S.C. § 2255* (Doc. 94) be **DENIED** and that this action be **DISMISSED.**

Petitioner's *Motion for Discovery* (Doc. 98) and *Motion to Reinstate Previously Filed Motions* (Doc. 112) are **DENIED**.

## Facts and Procedural History

On September 25, 2012, Petitioner pled guilty, pursuant to the terms of his *Plea Agreement* (Doc. 31), to conspiracy to distribute and to possess with intent to distribute over 1000 kilograms of marijuana, in violation of 21 U.S.C. § 846, and money laundering, in violation of 18 U.S.C. § 1956(h).  On March 27, 2013, the Court imposed an aggregate term of imprisonment of 120 months, to be followed by a term of supervised release of five (5) years.

*Judgment* (Doc. 71.)  On August 29, 2014, the United States Court of Appeals for the Sixth Circuit affirmed the judgment of this Court.  *United States of America v. Antwane J. Rhodes*, No. 13-3417 (6th Cir. Aug. 29, 2014).

On August 26, 2015, Petitioner filed the *pro se Motion to Vacate under 28 U.S.C. § 2255,* alleging that Anthony Laird, a confidential informant for the government, interfered with his attorney-client relationship, thereby violating Petitioner's rights under the Sixth and Fifth Amendments (claim one); that he was denied a fair trial based on prosecutorial misconduct in connection with the knowing presentation of false evidence and the prosecutor's alleged violation of the Rules of Professional Conduct (claim two); and that his guilty plea was not knowing and voluntary because it was entered based on the ineffective assistance of counsel (claim three).  Respondent contends that Petitioner's claims lack merit.

## Motion for Discovery

Petitioner seeks discovery pursuant to Rule 6 of the Federal Rules of Civil Procedure in support of his first claim for relief – *i.e.,* that Laird, the confidential informant, lied to the government, to Officer John West, and to the grand jury.  Petitioner seeks production of a copy of an "Affidavit of Probable Cause" used to secure action by the grand jury and of a copy of the transcript of the testimony presented to the grand jury by Laird and West, so that he might establish that Laird and West lied.  *Motion for Discovery* (Doc. 98, PageID# 731-32).  Petitioner also seeks discovery of what he describes as "sealed relator's notes" and "any and all statements made to the relator" by Assistant United States Attorney Kevin Kelley in regard to Petitioner's Attorney, Javier Horacio Armengau, and Laird.  Petitioner explains that this discovery will assist him in establishing that the prosecutor knew about an alleged conspiracy between Armengau and

Laird to wrongly convict Petitioner of the charges against him.  Petitioner also refers to disciplinary proceedings against Attorney Armengau.  *See* Doc. 98-1 (PageID# 733-36).

A habeas corpus petitioner is not entitled to discovery as a matter of right.  *Bracy v. Gramley*, 520 U.S. 899 (1997); *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001).  "Rule 6(a) of the Rules Governing 2255 Proceedings allows the district court to enable further discovery in a habeas proceeding where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief."  *Thomas v. United States*, — F.3d —, 2017 WL 727152, at *7 (6th Cir. Feb. 24, 2017)(citing *Harris v. Nelson*, 394 U.S. 286, 300 (1969); *Cornell v. United States*, 472 Fed.Appx. 352, 354 (6th Cir. 2012)).  Where a petitioner fails to make a "fact specific showing of good cause under Rule 6," the court will deny the discovery request as a mere fishing expedition.  *Stanford; Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004).  "Bald assertions and conclusory allegations do not provide sufficient grounds to warrant requiring the government to respond to discovery or to require an evidentiary hearing."  *Thomas v. United States*, 2017 WL 727152, at *7 (citing *Stanford*, 266 F.3d at 460).

Petitioner's allegations regarding Laird and a conspiracy between Laird and Armengau – and the prosecutor's alleged knowledge of that conspiracy – are entirely speculative and are belied by Petitioner's own guilty plea.  For the reasons more clearly articulated *infra*, this Court concludes that Petitioner has failed to establish good cause for the requested discovery and has failed to set forth any specific allegations establishing that he may be entitled to relief.  His discovery request constitutes nothing more than a mere fishing expedition.

Petitioner's request for discovery is therefore **DENIED**.

3

Moreover, Petitioner's request for the appointment of a special prosecutor, *see Reply*, Doc. 111, is for the same reason **DENIED.**

### Standard of Review

In order to obtain relief under 28 U.S.C. § 2255, a petitioner must establish the denial of a substantive right or defect in the trial that is inconsistent with the rudimentary demands of fair procedure. *United States v. Timmreck*, 441 U.S. 780 (1979); *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (*per curiam*).  Relief under 28 U.S.C. § 2255 is available when a federal sentence was imposed in violation of the Constitution or laws of the United States or when the trial court lacked jurisdiction, when the sentence was in excess of the maximum sentence allowed by law, or when the judgment or conviction is "otherwise subject to collateral attack." *United States v. Jalili*, 925 F.2d 889, 893 (6th Cir. 1991).  In the absence of constitutional error, the question is "whether the claimed error was a 'fundamental defect which inherently results in a complete miscarriage of justice,' " *Davis v. United States*, 417 U.S. 333, 346 (1974)(quoting *Hill v. United States,* 368 U.S. 424, 428–429 (1962); *see also Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2006).  However, "'[a] § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exception circumstances.' " *DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996)(quoting *United States v. Brown*, 62 F.3d 1418 (6th Cir. 1995)(unpublished)).  Further, non-constitutional claims not raised at trial or on direct appeal are waived on collateral review except where the errors amount to something akin to a denial of due process. Accordingly, claims that could have been raised on direct appeal, but were not, will not be entertained on a motion to vacate under § 2255 unless the petitioner shows: (1) cause and actual prejudice sufficient to excuse his failure to raise the claims previously; or (2) that he is

"actually innocent" of the crime.  *Ray v. United States,* 721 F.3d 758, 761 (6th Cir. 2013)(citing

*Bousley v. United States*, 523 U.S. 614, 622 (1998)) (internal citations omitted).

> A petitioner who entered a guilty plea must show an error of constitutional magnitude that had a substantial and injurious effect or influence on the proceedings.  *Griffin v. United States,* 330 F.3d 733, 736 (6th Cir. 2003)(citing *Abrahamson,* 507 U.S. at 637). Therefore, a court may only grant relief under § 2255 if the petitioner demonstrates "'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *Id.* at 736 (quoting *Davis v. United States*, 417 U.S. 333, 346 (1974)).  A petitioner further bears the burden of articulating sufficient facts to state a viable claim for relief under § 2255.  Vague and conclusory claims which are not substantiated by allegations of specific facts with some probability of verity are not enough to warrant relief.  A § 2255 motion may be dismissed if it only makes conclusory statements without substantiating allegations of specific facts and fails to state a claim cognizable under § 2255.  *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961).

*United States v. Noble*, No. 1:14-cr-135, 2017 WL 626130, at *3 (N.D. Ohio Feb. 15, 2017).

### Claim One

Petitioner alleges in his first claim that he was induced by Anthony Laird, a confidential

informant, to enter into an attorney-client relationship with Javier Armengau at the same time

that Laird was obtaining evidence against Petitioner for the government in this case, and prior to

the filing of the *Indictment*.  According to Petitioner, Armengau helped Laird provide the

prosecutor with false and incriminating information against Petitioner, thereby interfering with

Petitioner's right to counsel and his right against self-incrimination.  In support of this claim,

Petitioner refers to a June 13, 2014, *Motion for Immediate Interim Remedial Suspension* filed by

the Columbus Bar Association against Armengau, *see Motion to Expand the Record* (Doc. 96-1,

PageID# 577), which indicates in relevant part as follows:

> Beginning in 2010, both federal and state law enforcement officials engaged in a joint investigation into narcotics trafficking involving

a number of suspects in central Ohio.  Included in this group of suspects was a person who became a confidential informant (referred to here as "C.I.")  Also in the group [was]. . . Antwane Rhodes.

Attorney Armengau first represented C.I. in federal court proceedings arising out of the joint investigation.  On behalf of his client, Armengau negotiated a plea agreement under the terms of which C.I. agreed to cooperate fully and become a confidential informant (CI) as to any drug activity he had knowledge of taking place in the Southern District of Ohio including Franklin County. C.I. and Armengau signed that agreement.  Although the agreement was dated and signed on December 2, 2009, it was not filed with the court until August 12, 2010.  Armengau was C.I.'s attorney during that entire period and through his subsequent sentencing.

Concurrently, despite a major and obvious conflict, Armengau undertook the representation of [] Rhodes. . . . [T]he federal prosecutors (in the Rhodes case) recognized the conflict and repeatedly warned Armengau he needed to remove himself as an attorney. . . . Armengau refused to withdraw[.]

***

In March 2011, Antwane Rhodes became aware he was under investigation.  He hired Javier Armengau to represent him. . . . When Rhodes hired Armengau to represent him, the Federal Grand Jury had begun its investigation of Rhodes and others.  It was during this critical time that the co-defendant, C.I., who was heavily involved in the same conspiracy, was proffering regularly with the government, providing information about others who were also involved.  According to the U.S. Attorneys, there was over a year of covert investigation that became overt in March 2011, with the execution of a search warrant at several locations, including the residence of Antwane Rhodes.  Armengau's client at that time, C.I., provided the information that led to these searches.

According to AUSA Kevin Kelley, he specifically told Armengau he had a conflict in his representation of Rhodes because of his representation of C.I., who had been cooperating in the investigation of Rhodes. . . . Kelley told Armengau that information obtained from C.I. was utilized in the federal search warrant that had been obtained for Rhodes' residence.  The prosecutors warned Armengau that C.I. was a potential witness in any subsequent criminal case involving Rhodes.  Clearly, C.I. was

> fulfilling the agreement with the government that Armengau had negotiated, and there was no way he could effectively represent Rhodes with such a conflict.  Armengau disagreed with Kelley, stating that if Rhodes chose to plead, any potential conflict would be limited.  However, Rhodes decided against cooperating.
>
> Rhodes was indicted on June 1, 2012, and arrested on June 4, 2012.  Rhodes fired Armengau and hired Attorney Jon Paul Rion.

(PageID 577-78).[1]  Between March 16, 2011, and June 1, 2012, according to Petitioner, Laird and Armengau perpetrated a fraud on the government by incriminating Petitioner as criminally responsible for Laird's criminal actions.  *Memorandum in Support* (Doc. 95, PageID# 518). Petitioner alleges that Laird advised the co-defendants that Petitioner was acting a government informant against them.  He maintains that the government violated *Weatherford v. Bussey*, 429 U.S. 545, 558 (1977), because Laird sat in on a meeting between Petitioner and Armengau, and Petitioner lost the opportunity to provide substantial assistance to the government in connection with the investigation of Laird's involvement in the conspiracy.  Petitioner now claims that, but for the ineffective performance of Attorney Armengau, he would have sought a negotiated plea agreement and offered substantial assistance to the government.  Petitioner further alleges that Armengau misled him to believe that he faced only minor tax problems and a potential charge of possession of marijuana.  According to Petitioner, Armengau failed to convey the government's plea offer prior to the filing of the *Indictment.  Reply* (Doc. 111, PageID# 778-81).  Petitioner now denies his guilt on the charges against him.  He states that he acted only as an intermediary between Laird and Laird's drug suppliers, and that Laird and Armengau lied when they

---

[1] Petitioner also refers to Armengau's July 2014, conviction on charges of  public indecency, gross sexual imposition, rape, kidnapping, and sexual battery, for which Armengau is currently serving a prison term.  *See Judgment Entry* (Doc. 96-2, PageID# 603-04).  On July 8, 2014, the Ohio Supreme Court suspended Attorney Armengau from the practice of law.  *Columbus Bar Assn. v. Armengau*, No. 2014-0997, 139 Ohio St.3d 1469 (Ohio 2014).  However, it is not apparent, and Petitioner does not indicate, how Armengau's subsequent criminal conviction might be relevant to this case.

convinced the government that Petitioner had acted as the drug supplier.  *Affidavit of Antwane J. Rhodes* (Doc. 96-7, PageID# 691-94, 697-99).

In support of this claim, Petitioner has attached, *inter alia*, an affidavit from his former defense counsel, Attorney Jon Paul Rion.  *Affidavit of Jon Paul Rion* (Doc. 96-8, PageID# 702). Rion states in relevant part as follows:

> Shortly after the indictment I contacted the U.S. Attorney and we discussed the case.  I was informed that because Mr. Rhodes had declined to cooperate against other individuals, his options were very limited;

> It was clear that Mr. Armengau and the U.S. Attorney had engaged in substantive and meaningful negotiations prior to the indictment and that the pre-indictment phase was critical to Rhodes' case and the options he had for resolving the case;

> It is also clear that because Mr. Armengau and Mr. Rhodes declined to speak with agents during that time, Mr. Rhodes was significantly impaired in his ability to receive a lesser sentence;

> At issue in the disciplinary proceedings [against Armengau] was whether Mr. Armengau engaged in misconduct by representing co-defendants with conflicting interests.  It has now been determined, and is still being discovered, that the conflict in Mr. Armengau's representation was non-waivable, the extent of which was never disclosed to myself or Mr. Rhodes;

> It is my belief that not only was the conflict of interest undisclosed but Mr. Armengau actually misled Mr. Rhodes by stating that his other client – the codefendant, who was also the confidential informant in Rhodes' case – was not providing information against Mr. Rhodes.  This misinformation was significant because Mr. Rhodes relied upon it in deciding not to cooperate;

> But for his attorney's statements, Mr. Rhodes would not be serving a full 10 year sentence;

> The U.S. Attorney was aware of the conflict prior to the indictment, and though he informed Mr. Armengau that he could not represent Mr. Rhodes, neither the court nor Mr. Rhodes were made aware of the issue;

> New evidence was disclosed as a result of the disciplinary hearing that was not available at the time of the plea. It was revealed. . . that the case against the confidential informant (co-defendant) was active much earlier than originally known. The co-defendant, through his representation with Mr. Armengau, negotiated and signed a plea agreement in December of 2009, though the case was not filed until August of 2010. Thus, the case was ongoing and substantive proceedings were commenced much earlier than myself or Mr. Rhodes were aware. This was never disclosed by Armengau and was only learned through the disciplinary action; . . . .

*Id.* (PageID# 702-03). Petitioner has also attached a number of other affidavits, the *Affidavit of Karissa B. Sharp*, his former fiancée, (Doc. 96-9, PageID# 705); the *Affidavit of Jessica Wilkins-Bibbs* (Doc. 96-10, PageID# 707-08); the *Affidavit of Donte L. Rhodes* (Doc. 96-11, PageID# 710-11); and copies of purported text messages exchanged by Petitioner and Attorney Armengau prior to the filing of the *Indictment.* (Doc. 96-13, PageID# 714-29).

Petitioner has failed to establish a basis for federal habeas corpus relief on this claim.

"'[T]he Fourth Amendment [does not protect] a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.'" *United States v. Henry*, 447 U.S. 264, 272 (1980)(quoting *Hoffa v. United States*, 385 U.S. 293, 302 (1966) and citing *United States v. White*, 401 U.S. 745 (1971)). "Similarly, the Fifth Amendment has been held not to be implicated by the use of undercover Government agents [to obtain incriminating statements from persons not in custody but suspected of criminal activity] before charges are filed because of the absence of the potential for compulsion." *Id.* (citing *Hoffa,* 385 U.S. at 303–304). Moreover, Petitioner has waived, in view of his guilty plea, any claim under the Sixth Amendment involving the government's alleged interference with his right to counsel. "Generally, a voluntary and unconditional guilty plea 'bars any subsequent non-jurisdictional attack on the conviction.'" *United States v. Corp*, 668 F.3d 379, 384 (6th Cir. 2012) (internal

quotations omitted)(holding that a defendant who pled guilty thereby waived any defense to the charge under the Commerce Clause).

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was [constitutionally ineffective].

*Tollett v. Henderson*, 411 U.S. 258 (1973). Further, "[i]neffective assistance of counsel claims based on pre-plea conduct that does not affect the voluntariness of the decision to plead guilty is such a non-jurisdictional defect." *Tipton v. United States*, No. 1:15-cv-00250-MR; 1:12-cr-00025-MR-DLH-1, 2016 WL 1354979, at *5 (W.D. North Carolina April 5, 2016)(citing *United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997); *Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992); *United States v. Moussaoui,* 591 F.3d 263, 279 (4th Cir. 2010)(holding that arguments alleging pre-plea Sixth Amendment violations were "not cognizable" because the violations had been waived by defendant's guilty plea); *Fields v. Att'y Gen. of Md*., 956 F.2d 1290, 1296 (4th Cir. 1992)(holding that a guilty plea waived a claim of the denial of constitutionally required counsel "that occurred prior to" the guilty plea and was "unrelated to it").

Moreover, the United States Court of Appeals for the Sixth Circuit has rejected Petitioner's claim that he was denied the effective assistance of counsel based on Attorney Armengau's alleged conflict of interest prior to the filing of the *Indictment*, reasoning that "Armengau did not represent Rhodes at any critical stages of his criminal proceedings." *United States v. Rhodes*, No. 13-3417 (6th Cir. Aug. 29, 2014). *See Order* (Doc. 90, PageID# 482).

Rhodes suggest[s] that Rhodes's indictment should be dismissed because Rhodes's first attorney labored under an "actual conflict of interest." Counsel explains that Rhodes was initially represented by Attorney Javier Armengau, and "[u]nbeknownst to Rhodes, Armengau was facing criminal charges of his own." When Armengau's situation "came to light, Rhodes was assigned new counsel."

A criminal defendant is presumptively prejudiced "when counsel is burdened by an actual conflict of interest." *Strickland v. Washington,* 466 U.S. 668, 692 (1984). But "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" An actual conflict will not be found unless a defendant can identify "specific instances in the record to suggest an actual conflict or impairment of [his] interests." *United States v. Hall*, 200 F.3d 962, 965-66 (6th Cir. 2000)(citation omitted).

Rhodes does not present any evidence of an actual conflict of interest resulting from Armengau's own pending criminal charges and his simultaneous representation of Rhodes for a very short period of time. The record indicates that Rhodes was indicted on June 1, 2012. On June 4, 2012, Rhodes self-surrendered to law enforcement agents in response to an arrest warrant. Attorney Steven Nolder was present on Rhodes's behalf at his initial appearance, which was also held on June 4, 2012. Armengau entered his appearance for Rhodes on June 5, 2012, but on that same date, Rhodes's motion for substitute counsel was granted and Attorney Jon Rion was substituted as counsel for Rhodes in place of Armengau. Attorney Rion represented Rhodes from June 5, 2012, until the conclusion of the criminal proceedings.

Armengau did not represent Rhodes at any critical stages of his criminal proceedings. In fact, Rion replaced Armengau on the same day that Armengau entered an appearance on Rhodes's behalf. Rion, not Armengau, represented Rhodes during his criminal case, including plea negotiations and sentencing. Moreover, Rhodes has made no showing that he suffered any prejudice, or that his case was adversely affected in any way, during Armengau's extremely short period of participation in his case.

*Id*. (PageID# 485-86). Thus, to the extent that Petitioner bases this claim on Armengau's conflict

of interest arising out of his own criminal charges, the Sixth Circuit has already rejected this

claim and this Court will not now again address that issue here.  *See Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999)("It is well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law.").  Further, the Sixth Circuit has adhered to a "bright-line rule" holding that the right to counsel in plea negotiations attaches only after the filing of formal charges. *Turner v. United States*, — F.3d —, 2017 603848, at *3-4 (6th Cir. Feb. 15, 2017)(citing *United States v. Moody*, 206 F.3d 609 (6th Cir. 2000)).  Therefore, Petitioner has failed to establish that he is entitled to relief on this basis.

Moreover, the record fails to support Petitioner's claim that the government impermissibly intruded on his attorney-client relationship.  State interference with the attorney-client relationship may rise to the level of a violation of the Sixth Amendment right to counsel, *see Sanborn v. Parker*, 629 F.3d 554, 576 (6th Cir. 2010)(citing *Gideon v. Wainwright*, 372 U.S. 335, 342–43 (1963),  where the petitioner can establish both that the impermissible intrusion and actual prejudice.  *Id*. (citing *Weatherford*, 429 U.S. at 550–59); *see also United States v. Steele*, 727 F.2d 580, 585-86 (6th Cir. 1984)(outlining factors to consider in determining whether there has been an invasion of the attorney-client privilege so egregious as to give rise to a Sixth Amendment violation)(citations omitted).  Petitioner cannot meet this burden here.  The *Indictment* charged Petitioner with drug trafficking and money laundering from 2007 until 2010. By Petitioner's account, he hired Armengau in March 2011, *i.e.,* after the events giving rise to the charges.  Further, nothing in the record even suggests that the government obtained privileged information from Laird based on Laird's intrusion into or interference with Petitioner's attorney-client relationship with Armengau or that Petitioner declined to enter into a plea agreement because of Laird's interference with that attorney-client relationship.

Additionally, Petitioner's current allegation that he is actually innocent of the charges against him and that Laird is guilty of the crimes charged against Petitioner is simply not worthy of credit in view of Petitioner's admission, under oath, of guilt to the charges on which he stands convicted.

> [T]he representations of the defendant, his lawyer, and the prosecutor at [a guilty plea proceeding], as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

*Blackledge v. Allison*, 431 U.S. 63, 73–75 (1977).   At  Petitioner's  guilty  plea  proceeding, Detective Mike Kididis recited the following statement of facts supporting the charges:

> Since November 2007, detectives/agents of the Columbus Division of Police Narcotics Bureau, Franklin County Sheriff's Office, and the Internal Revenue Service Criminal Investigation have been investigating a major narcotics trafficking organization in the Columbus, Ohio area.   The investigation identified Rigoberto Gomez-Gomez, AKA Choppa, as part of a group leading this drug trafficking organization who was obtaining multiple kilogram quantities of cocaine and hundred pound quantities of marijuana at a time.  In the course of that investigation, a number of cooperating defendants agreed to plead guilty and provided information regarding other participants in narcotics activities.
>
> Sources identified Marc Clark and Antwane Rhodes as the leaders of the Columbus, Ohio drug trafficking organization that included Springfield, Ohio.   Loads of marijuana were received from a variety of sources, sometimes via shipment to a warehouse on the west side and/or residences in Columbus, Ohio.  Marc Clark, Steve Blackmon, Erik Neely, Shawnte Lynn and Jayson Reed were all identified as having received and distributed multiple pound quantities of these marijuana loads.
>
> In 2007 through 2008, Antwane Rhodes developed a Mexican marijuana source that started supplying Rhodes with Marijuana shipments consisting of 100 to 200 pounds at a time which were being delivered to Rhodes' residence in a motorcycle trailer.  From

these loads, Rhodes was supplying marijuana to Marc Clark, Shawnte Lynn, Erik Neely and Steve Blackmon.

***

In early 2008 Rhodes began receiving 400 to 600 pounds of marijuana once every four to six weeks, and before the year's end the loads increased to as much as 1,200 to 1,800 pounds per load.

In late 2009/early 2010, Rhodes had a falling out with his marijuana source and began receiving smaller quantities of hydroponic marijuana from the courier of his former marijuana source which Rhodes then supplied to Neely, Clark, Lynn and Blackmon.

Rhodes stopped selling marijuana in the fall of 2010 after making surveillance as he was leaving the residence of Marc Clark.

Evidence shows Antwane Rhodes earned a substantial amount of income from the sale of marijuana which he laundered in various ways, to include the purchases of vehicles, custom jewelry, depositing of U.S. currency derived in the sale of marijuana into bank accounts established in the name of a shell company called T & J Investments of Ohio LTD and other accounts associated with Rhodes, and by converting U.S. currency into the form of checks and/or money orders which he deposited into his various bank accounts.

Evidence shows Antwane Rhodes made trips to Las Vegas, Nevada, with his co-conspirators in June of 2009 and 2010 where he used his drug proceeds to purchase custom jewelry from a Los Angeles jeweler named Eli Yona. During both trips, Rhodes provided his co-conspirators with under $10,000 cash each to carry on their person for him during the flight to Las Vegas. Evidence revealed Rhodes purchased jewelry from Eli Yona totaling approximately $151,500 in 2009 and $67,682 in 2010.

***

Evidence further revealed Rhodes loaned drug proceeds in the form of U.S. currency to individuals and received repayment on said loans in the form of checks and cashier's checks, which Rhodes deposited into the bank accounts of T & J Investments and Antwane Rhodes. Specifically, Rhodes used his illegal proceeds to make interest free cash loans to Tedaryl Fason of CNT Marketing Services to fund real estate rehab construction projects. Once the

rehab projects were finished and the project money was collected, the cash loans were repaid to Rhodes in the form of checks which were deposited into the bank accounts of T & J Investments and Antwane Rhodes.  Evidence shows Rhodes deposited checks representing loan repayments from Fason totaling $50,782.51 in 2008 and $25,485 in 2009.  Evidence further revealed that Rhodes never worked on a project or received a portion of any profit made on a project.

Evidence further revealed Rhodes laundered his illegal drug proceeds by making a $100,000 loan plus 15 percent cash loan in July or August 2009 to an individual named Dennis Lewis of Ashley Investments, the monies of which were used to fund rehab investment properties.  At the request of Rhodes, Lewis repaid the majority of a $100,000 loan, plus $15,000 interest, in the form of checks payable to T & J Investments.  An analysis of the bank accounts of T & J investments revealed check deposits representing loan repayments from Dennis Lewis and Ashley Investments totaling $91,000 in 2010.

On August 27, 2009, Rhodes laundered his illegal drug proceeds by purchasing a 2010 Chevrolet Camero from Jeff Wyler Springfield, Incorporated for $41,480.46, which was titled in the name of Karissa Sharp.  Rhodes paid an $18,000 down payment and financed the remaining $23,480.46 balance with JP Morgan Chase Bank.  The $18,000 down payment consisted of $2,100 cash, a $9,400 Chase Bank cashier's check purchased by Rhodes, and a $6,500 Fifth Third Bank cashier's check purchased by Karissa Sharp with $3,600 cash and a $2,900 cash withdrawal from her Fifth Third Bank savings account.  An analysis of Sharp's Fifth Third Bank account showed a $2,700 cash deposit being made to the account on August 20, 2009, seven days prior to the cashier's check purchase.  In addition, records obtained from JP Morgan Chase showed Rhodes made auto loan payments totaling $12,890 from September 24, 2009 to March 14, 2011, the majority of which were paid with money orders.

On July 1, 2010, Rhodes laundered his illegal drug proceeds by purchasing a black 2006 Ford F150 truck for $22,000, which was paid with $9,500 cash and a $12,500 JP Morgan Chase Bank cashier's check that was purchased by Rhodes on July 1, 2010, with a $12,500 cash withdrawal from the JP Morgan Chase Bank account of T & J Investments.  Records from JP Morgan Chase revealed Rhodes deposited $9,500 cash to the T & J Investments account on June 30, 2010.

15

\*\*\*

>During a controlled undercover meet on October 14, 2010, Antwane Rhodes provided a confidential informant with a plastic bag containing $37,405 cash to purchase a 2008 GMC Denali from the Manheim Auto Auction.  After the meeting, the cash was convered into a cashier's check payable to Manheim, Pennsylvania for $37,405 and mailed to Manheim, Pennsylvania.
>
>On October 20, 2010, Rhodes flew to Harrisburg, Pennsylvania to take possession of the Yukon Denali from Manheim Auto Auction and then drove the vehicle back to Columbus, Ohio.
>
>On October 22, 2010, the confidential informant accompanied Rhodes to the Ohio Bureau of Motor Vehicles where Rhodes transferred the Denali title into the name of Karissa Sharp.
>
>Testimony and information obtained from cooperating defendants, witnesses, confidential informants, surveillance, trash pulls and traffic stops established that Antwane Rhodes was responsible for distributing at least 1,000 kilograms, but less than 3,000 kilograms, of marijuana.
>
>These events occurred in the Southern District of Ohio from approximately the beginning of 2007 through the summer of 2010.

*Transcript* (Doc. 53, PageID# 294-99).  Petitioner admitted the truth of these facts, with minor exceptions.  *Id.* (PageID# 303-08).[2]  Petitioner acknowledged, through his counsel, that he had received and distributed more than one thousand kilograms of marijuana.  *Id.* (PageID# 304).

In light of this record, Petitioner will not now be heard to proclaim his actual innocence on the charges. In short, this claim fails to offer a basis for habeas relief.

---

[2] Petitioner denied knowledge of the Gomez-Gomez/Choppa group; he acknowledged that he had sold, received, and distributed marijuana, but he argued that he did not have a leadership role in the offense.  He indicated that, although he received pounds of marijuana, the drugs did not go to his home, but to other locations where it was then distributed.  *Transcript* (Doc. 53, PageID# 303-04).  He claimed that informants had overstated or exaggerated the magnitude of the drug activity in which he had been involved.  *Id.* (PageID# 305).  He noted that the T & J Investment Company actually engaged in house repairs.  *Id.* (PageID# 305-06).

**Prosecutorial Misconduct**

Petitioner claims that the prosecutor knowingly presented false testimony that adversely affected Petitioner's sentence.  *Memorandum in Support* (Doc. 95, PageID# 525).  Specifically, Petitioner refers to statements contained in search warrant affidavits (*see* Docs. 96-3; 96-4), which he claims are based on Laird's lies.  Essentially, Petitioner again argues that he is innocent of the charges against him, and again claims that he was wrongly convicted of the charges. *Memorandum in Support* (Doc. 95, PageID# 527-37).  Petitioner also complains that the government improperly failed to disclose Armengau's conflict of interest prior to the filing of the *Indictment*, and withheld from Petitioner, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), evidence that Armengau had negotiated a plea agreement for Laird that included a provision that Laird would assist in the prosecution of Petitioner. *Id.* (PageID# 544).  Petitioner also alleges that the prosecutor violated professional rules of conduct by failing to disclose this information.  *Id.* (PageID# 548-553.)

In *Brady v. Maryland*, 373 U.S. 83, the United States Supreme Court held that

> the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Id.* at 86.  Evidence is material "[i]f there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. at 682.  "[T]here is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  *Strickler v. Greene*, 527 U.S. 263, 281 (1999).  "In the absence of prejudice, even assuming a violation of *Brady*, reversal is not required."  *United States v. Jones*,

766 F.2d 994, 998 n. 1 (6th Cir.1985)(citing *United States v. Campagnuolo*, 592 F.2d 852, 861 &

n. 9 (5th Cir. 1979)).

> [T]he "mere possibility" that the evidence might have aided the defense or might have affected the outcome of the trial does not satisfy the materiality element. *United States v. Agurs*, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Also, a belated disclosure of evidence violates *Brady* only where a petitioner can show that the delay itself caused prejudice. *O'Hara v. Brigano,* 499 F.3d 492, 502 (6th Cir. 2007).

*Overbay v. Carlton*, No. 2:07-cv-155, 2008 WL 4682802 (E.D.Tenn. October 21, 2008).

Again, Petitioner's claim that he has been wrongly prosecuted on the basis of false evidence or lies is foreclosed by Petitioner's admission of guilt. The record fails to reflect either that the prosecutor failed to disclose material exculpatory information in violation of *Brady*, or that Petitioner was prejudiced thereby. Further, as noted by the Sixth Circuit, *see supra*, Petitioner secured new counsel upon the filing of the *Indictment*, and he therefore cannot establish a basis for federal habeas relief based on Armengau's representation of him prior to that time. *See Turner v. United States*, — F.3d —, 2017 603848, at *3-4. Moreover, the Court notes that Ohio's Rules of Professional Conduct would have prohibited the prosecutor from directly communicating with Petitioner, rather than through his counsel. Rule 4.2, Ohio Rules of Professional Conduct ('[A] lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.")

Petitioner's claim of prosecutorial misconduct fails to provide a basis for relief.

### Ineffective Assistance of Counsel

Petitioner alleges that his guilty plea was not knowing, intelligent or voluntary based on the ineffective assistance of counsel, because his attorney failed to investigate the quantity of

drugs attributed to him or Laird's lies. *Memorandum in Support* (Doc. 95, PageID# 557-59). Petitioner also complains that his attorney failed to challenge the validity of the government's affidavit of probable cause utilized to secure search warrants. *Id.*(PageID# 560). Had his counsel properly investigated these matters, Petitioner claims, the government could not have established the charges against him.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that counsel's performance was deficient, or that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment, and that this deficient performance prejudiced the petitioner. *Id.* at 687. This showing requires that defense counsel's errors were so serious as to deprive the defendant of a fair and reliable trial. *Id.*

"Surmounting *Strickland'*s high bar is never an easy task." *Padilla v. Kentucky*, 599 U.S. 356, 371 (2010). Given the difficulties inherent in determining whether an attorney's performance was constitutionally deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . ." *Strickland*, 466 U.S. at 689. Nevertheless, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. Therefore, a petitioner must also establish prejudice in order to prevail on a claim of ineffective assistance of counsel. *Id.* at 692.

In order to establish prejudice, a petitioner must demonstrate that a reasonable probability exists that, but for counsel's errors, the result of the proceedings would have been different. *Id.*

at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.  Because a petitioner must satisfy both prongs of *Strickland* in order to demonstrate ineffective assistance of counsel, should a court determine that the petitioner has failed to satisfy one prong, it need not consider the other.  *Id*. at 697.

Because a criminal defendant waives numerous constitutional rights when he pleads guilty, the guilty plea must be entered knowingly and voluntarily in order to be constitutionally valid.  *Boykin v. Alabama*, 395 U.S. 238, 244 (1969).  "'The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'"  *Sparks v. Sowders*, 852 F.2d 882, 885 (6th Cir. 1988) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).  In applying this standard, a court must look at the totality of the circumstances surrounding the plea.  *Id*.  A criminal defendant's solemn declaration of guilt carries a presumption of truthfulness.  *Henderson v. Morgan*, 426 U.S. 637, 648 (1976).  Further, a criminal defendant cannot successfully challenge the voluntariness of his plea merely on the basis that he was motivated to plead guilty.  *Brady v. United States*, 397 U.S. 742, 750 (1970).

However, a petitioner may challenge the entry of a plea of guilty on the basis that counsel's ineffectiveness prevented the plea from being knowing and voluntary.  *Tollett v. Henderson*, 411 U.S. 258, 267 (1973).  *Strickland*'s two part test applies to challenges to guilty pleas based on a claim of ineffective assistance of counsel.  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *Sparks v. Sowders*, 852 F.2d 882, 884 (6th Cir. 1988).  In order to obtain relief on that basis, however, a petitioner raising such a claim must first show that counsel's advice was not within the range of competence demanded of attorneys in criminal cases.  *Hill,* 474 U.S. at 59; *Sparks*, 852 F.2d at 884.

> The second, or "prejudice" requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

*Hill,* 474 U.S. at 59; *Sparks,* 852 F.2d at 884. Petitioner has failed to meet this standard here.

On August 13, 2012, defense counsel filed a *Motion to Suppress* evidence obtained by police upon the execution of the search warrant. *Motion to Suppress* (Doc. 21). However, Petitioner did not proceed with the motion, and instead entered a guilty plea. Petitioner agreed that his relevant conduct involved between 1000 and 3000 kilograms of marijuana. *Plea Agreement* (Doc.31, PageID# 209). As noted by the Respondent, five co-defendants had already pleaded guilty and had agreed to cooperate in the prosecution of Petitioner. Thus, neither Laird's testimony nor the two pounds of marijuana seized from Petitioner's home in March 2011 constituted the sole – or even primary – evidence against Petitioner in this case. Despite Petitioner's lengthy arguments to the contrary, the record does not indicate that the government would have been unable to establish the charges against him. To the contrary, the government appears to have had substantial evidence of Petitioner's guilt. By the entry of his guilty plea, Petitioner secured the dismissal of four of the charges against him and thereby significantly reduced his potential prison exposure. He also obtained a three level reduction in his recommended sentence under the United States Sentencing Guidelines for his acceptance of responsibility and for timely notifying authorities of his intent to plead guilty, despite being the last of the co-defendants to enter a guilty plea. *Id.* (PageID# 211). Petitioner also retained the possibility of obtaining a motion for downward departure from the government based on his potential substantial assistance. *Id.* (PageID# 292.) The government agreed that Petitioner's

sentence should not be enhanced based upon his leadership role in the offenses, despite facts suggesting otherwise. *See Sentencing Transcript* (Doc. 82, PageID# 442-43). The government also agreed that Petitioner's sentence would not be enhanced by virtue of his possession of a firearm in connection with the drug offense, although police seized two pounds of marijuana, $28,000 in cash, a bulletproof vest, and a .380 semi-automatic loaded Beretta when they executed the search warrant in March 2011 at Petitioner's house. *See Plea Agreement* (Doc. 31, PageID# 210); *Presentence Investigation Report*, ¶ 48-50; *Sentencing Transcript* (Doc. 82, PageID# 444).

At the time of Petitioner's guilty plea hearing he denied being under the influence of drugs or alcohol. *Transcript* (Doc. 53, PageID# 284). Petitioner indicated that he had reviewed the *Plea Agreement*, and had discussed the charges against him, as well as any potential defenses to those charges, with his counsel. *Id.*(PageID# 285). Petitioner was completely satisfied with the advice and representation of his counsel. *Id.* The Court advised Petitioner that he faced a mandatory term of ten years in prison up to life in prison on Count 1, and a maximum term of twenty years on Count 6. *Id.* (PageID# 287). Petitioner indicated that he understood. He had discussed the application of the sentencing guidelines with his counsel. *Id.* (PageID# 287-88). Petitioner denied being forced or coerced into entering the guilty plea. *Id.* (PageID# 293). He was pleading guilty of his own free will and because he was in fact guilty of the crimes to which he pleaded guilty. *Id.* Petitioner was advised of all the elements of the offenses. *Id.* (PageID# 300-303). Petitioner indicated that he understood those elements. As previously noted, he agreed with the summary of facts supporting the charges to which he pleaded guilty. *Id.* (PageID# 303-08). The Court advised Petitioner of all of the rights the he was waiving by entry of his guilty plea and Petitioner indicated that he understood. *Id.* (PageID# 309-311). Petitioner

affirmed his desire to plead guilty. *Id.* (PageID# 313). Petitioner's recommended sentence under the advisory United States Sentencing Guidelines was 121 to 151 months' incarceration. *Statement of Reasons* (Doc. 72, PageID# 401); *Sentencing Transcript* (Doc. 82, PageID# 457). The Court imposed the statutory mandatory minimum term of 120 months' incarceration. *Id.* (PageID# 457, 458, 459).

Petitioner has failed to establish that, but for the ineffective performance of defense counsel, he would not have pleaded guilty, but would have proceeded to trial. His claim that his guilty plea was not knowing, intelligent or voluntary because of the ineffective assistance of counsel is without merit.

### Recommended Disposition

Therefore, the Magistrate Judge **RECOMMENDS** that the *Motion to Vacate under 28 U.S.C. § 2255* (Doc. 94) be **DENIED** and that this action be **DISMISSED.**

Petitioner's *Motion for Discovery* (Doc. 98) and *Motion to Reinstate Previously Filed Motions* (Doc. 112) are **DENIED**.

### Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendati*on will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

    *s/ Norah McCann King*
Norah McCann King
United States Magistrate Judge
March 14, 2017